UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

UNITED STATES OF AMERICA,

                              Plaintiff,                    DECISION & ORDER and
                                                            REPORT & RECOMMENDATION

              v.                                            22-CR-6196FPG

DANIELLE D. HAMPTON,

                              Defendant.
_____


## PRELIMINARY STATEMENT

By Order of Hon. Frank P. Geraci, Jr., United States District Judge, dated

February 1, 2023, all pretrial matters in the above-captioned case have been referred to this Court

pursuant to 28 U.S.C. §§ 636(b)(1)(A)-(B).  (Docket # 27).

On January 24, 2023, the grand jury returned a three-count indictment against

Danielle D. Hampton.  (Docket # 1).  Count One of the indictment charges Hampton with

possession of cocaine with intent to distribute it, in violation of 21 U.S.C. §§ 841(a)(1) and

(b)(1)(C).  (*Id.*).  The second count charges Hampton with maintaining a premises – 304 Adams

Street, East Apartment, Rochester, New York – for the purpose of manufacturing, distributing,

and using cocaine, in violation of 21 U.S.C. § 856(a)(1).  (*Id.*).  The final count charges Hampton

with possession of firearms in furtherance of drug trafficking crimes, in violation of 18 U.S.C.

§ 924(c)(1)(A).  (*Id.*).  The indictment charges that each of the crimes occurred on or about

November 18, 2021.  (*Id.*).

Currently pending before the Court for report and recommendation are Hampton's

motions for a *Franks* hearing and suppression of tangible evidence seized during the execution of

a search warrant on November 18, 2021.[1]  (Docket ## 29, 43, 46).  Also pending before the Court is Hampton's motion seeking disclosure of the identity of confidential informants. (Docket # 29).  On June 26, 2023, this Court held an evidentiary hearing on Hampton's suppression motion.  (Docket ## 35, 37).  Following the hearing, Hampton filed post-hearing submissions, in which she maintains, *inter alia*, that the government violated its discovery and/or *Brady* obligations in connection with the suppression hearing.  (Docket ## 40 at 13-14; 46 at 4). For the reasons discussed below, I deny Hampton's motion for disclosure of confidential informants and her motion seeking an order finding that the government violated its disclosure obligations, and I and recommend denial of Hampton's motions for a *Franks* hearing and suppression of evidence.

## FACTUAL BACKGROUND

### I.    Warrant for 304 Adams Street

On November 17, 2021, Monroe County Court Judge Douglas Randall issued a warrant authorizing the search of 304 Adams Street, East Apartment, in the City of Rochester (the "Premises").  (Docket # 29-2).  The warrant authorized a search for cocaine and other controlled substances, and any evidence tending to demonstrate that a drug-related offense had been committed "or that a particular person [had] participated in the commission of such offense."  (*Id.* at 2).

---

[1]  Hampton filed several motions seeking other forms of relief, including an audibility hearing, *Brady* material, discovery, rulings pursuant to Federal Rules of Evidence 404(b), 608, and 609, *Jencks* material, preservation of rough notes, leave to file additional motions, sanctions for *Brady/Giglio* violations, and disclosure of expert witnesses.  (Docket # 29).  Each of the above-referenced motions was decided by the undersigned or resolved by the parties in open court on May 24, 2023.  (Docket ## 32, 33).

In her original motion papers, Hampton also sought suppression of statements.  (Docket # 29).  Hampton withdrew that motion during proceedings before the Court on June 26, 2023, based upon a resolution she reached with the government.  (Docket # 37 at 2-3).

The warrant was issued upon the application of Monroe County Deputy Sheriff Joshua Prance. (Docket # 29-1). In his application, Prance stated that the Monroe County Sheriff's Office ("MCSO"), along with the Rochester Police Department ("RPD") and members of United States Department of Homeland Security Investigations ("HSI"), had been conducting an investigation into illegal cocaine sales at the Premises. (*Id.* at 5). He further affirmed that a confidential informant he knew ("CI") had made controlled purchases of cocaine from the Premises during the course of the investigation. (*Id.*). Prance stated that the CI had previously provided reliable information concerning narcotics trafficking and gun possessions, which had led to controlled buys and felony arrests and convictions. (*Id.*).

According to Prance, he met with the CI during the first week of September 2021 "for the purpose of conducting a controlled purchase of cocaine from [the Premises]." (*Id.*). Prior to the controlled purchase, Prance searched the CI for controlled substances and found none, and provided the CI with funds with which to purchase cocaine from the Premises. (*Id.* at 5-6). The CI reported that he or she approached the Premises, rang the doorbell, and provided the funds to an unknown man who answered the door. (*Id.* at 6). The man handed the CI a quantity of suspected cocaine, and the CI returned directly to Prance's vehicle and turned over the cocaine to Prance. (*Id.*). Prance performed a field test on the suspected cocaine, which was positive for cocaine. (*Id.* at 6-7).

Prance arranged for the CI to participate in three additional controlled purchases from the Premises during October and November 2021. (*Id.* at 7-10). On all three occasions, the CI bought cocaine in the same manner as the September 2021 purchase described above. (*Id.*). During the second controlled purchase, an unknown man sold drugs to the CI, while an unknown

woman sold the drugs during the third and fourth purchases. (*Id.*). The last controlled purchase

occurred during the third week of November. (*Id.*).

Based upon this information, Prance applied for a warrant to search the Premises

for controlled substances, including cocaine, as well as other evidence of drug-related offenses.

(*Id.* at 2). Specifically, Prance requested permission to search for and seize:

> written records, books and computer records tending to show sale
> and trafficking of Cocaine and/or other controlled substances[,]
> and money showing profits from the sale of Cocaine and/or other
> controlled substances, safe deposit box records and keys, computer
> records, ledgers, notes or other writings reflecting deposit,
> withdrawal, investment, custody or location of money, real
> property, personal property or other financial transactions, records,
> ledgers[,] notes or other writing[s] reflecting ownership of said
> property, records reflecting the names, addresses and telephone
> numbers of persons from whom Cocaine and/or other controlled
> substances are purchased and sold, including but not limited to,
> address and telephone books, *including those contained in cellular*
> *telephones,* personal computers and/or Personal Data Assistants
> and telephone bills.

(*Id.*) (emphasis added). Judge Randall struck the clause "including those contained in cellular

telephones" from the warrant. (Docket # 29-2 at 2)

Judge Randall also struck the following paragraph in its entirety from the

proposed warrant:

> **Cellular Telephone Devices and Search the Contents of**
> **Cellular Telephone Devices** for any information that tends to
> identify the owner/user of said cellular telephone devices, IMSI
> and MSN numbers associated with said cellular telephone devices,
> affixed to it within the battery compartment or accessible by
> disassembly of the phone or embedded in the memory of the phone
> or associated and attached SIM cards, any information regarding
> web connectivity including web searches and website history, and
> records kept electronically or digitally within the telephone's
> memory, to include: a log of recent incoming and outgoing calls, a
> list of contacts or phone book, any text messages, any e-mail
> messages, any pictures/picture messages, any
> videos/video-messages, any information gleaned from applications

present on the phone such as social networking sites, any information relative to location information, and any information that tends to identify the user or subscriber of the phone, including telephone number, private ID numbers, and IP address.

(*Compare* Docket # 29-1 at 3-4 *with* Docket # 29-2 at 3).

The warrant issued by Judge Randall included the following provision authorizing the seizure of electronic devices used for video and/or audio surveillance:

> **Electronic devices used for the purposes of video and/or audio surveillance** to include surveillance cameras, video cameras, and any device to store media, video, pictures, and images from the cameras, to include digital video recorders, computers, laptops, wireless access devices, *cellular telephone devices*, or any other electronic devices used to store multimedia images, as well as the content of any such devices.

(Docket # 29-2 at 3-4 (emphasis added)).

Prance also sought permission to enter the Premises without notice. (Docket # 29-1 at 11). In support of this request, Prance represented, based upon his experience, that "surveillance cameras are commonly used in order to alert the dealers of the presence of [p]olice [o]fficers." (*Id.* at 12). The warrant issued by Judge Randall permitted executing officers to enter the Premises without prior notice. (Docket # 29-2 at 4).


## II.    Execution of the Search Warrant

On June 26, 2023, this Court conducted an evidentiary hearing concerning the November 18, 2021 execution of the search warrant for the Premises.[2] (Docket # 35). The government called Officer Cody Goodfriend, Sergeant Michael Anderson, and Special Agent Timothy O'Hara as witnesses; the defense called no witnesses. (*Id.*).

---

[2] The transcript of the hearing is referred to herein as "Tr. ___." (Docket # 37 ).

A.    **Testimony of Officer Goodfriend**

Goodfriend testified that at the time of the search he was an RPD officer assigned to the SWAT team, which was charged with executing high-risk search warrants. (Tr. 7). According to Goodfriend, the SWAT team was responsible for entering and securing the search location. (Tr. 13). Those responsibilities included locating and securing occupants inside the Premises and securing its perimeter during the search. (Tr. 8, 15-17).

Prior to executing the warrant on November 18, 2021, Goodfriend attended a meeting with his supervisors to discuss the Premises and the scope of the warrant. (Tr. 13-15). According to Goodfriend, the SWAT team entered the Premises at approximately 6:00 a.m., and he was one of the first members of the team to enter. (Tr. 8, 30). Goodfriend was unable to recall how many SWAT team members participated in the entry. (Tr. 30). Goodfriend testified that his role was to locate and secure individuals inside the Premises. (Tr. 15-16, 37-38).

Goodfriend entered through the main door to the apartment. (Tr. 10; Government's Exhibit ("G. Ex.") 1). Goodfriend proceed straight inside and observed a woman sitting at a computer desk directly in front of him. (Tr. 11; G. Ex. 1). Goodfriend identified himself as a police officer and instructed her not to move. (Tr. 11). According to Goodfriend, the woman stood up and went up a stairwell located next to the computer desk. (Tr. 11; G. Ex. 1). Goodfriend approached the computer desk, and other members of the SWAT team followed the woman up the stairs. (Tr. 12, 16-17).

As he approached, Goodfriend observed a handgun and a substance that appeared to be crack cocaine on the desk. (Tr. 12, 21-22, 33, 39; G. Exs. 2, 3). According to Goodfriend, he was the first member of the SWAT team to approach the computer, and no other SWAT team

member could have moved the gun before he observed it on the desk.  (Tr. 8, 38-39).
Goodfriend did not attempt to secure the gun.  (Tr. 20, 35).

   Goodfriend did not review the search warrant prior to entering the Premises, and
he did not search any part of the apartment that day.  (Tr. 8, 16, 38).  According to Goodfriend,
in the event he saw any evidence in plain view, his responsibility was to alert the investigators of
his observations.  (Tr. 19).  Goodfriend testified that the SWAT team secured the Premises
within approximately ten minutes of entry and that his role in the execution of the warrant was
complete at that point.  (Tr. 13, 30-31).

### B.   Testimony of Sergeant Anderson

   Anderson testified that at the time of the search he was an employee of the MCSO
and was a sergeant with the Greater Rochester Area Narcotics Enforcement Team ("GRANET").
(Tr. 47-48).  Anderson estimated that he has participated in the execution of more than two
hundred narcotics-related search warrants.  (Tr. 48-49).  Anderson testified, based upon his
experience investigating narcotics crimes, that firearms are common tools of narcotics traffickers
and that cellular phones frequently contain evidence of narcotics crimes, including evidence of
contact information for other drug dealers and drug users.  (Tr. 49, 66).  According to Anderson,
he considers a variety of factors in assessing whether a particular phone is likely to contain
evidence of narcotics crimes, including the phone's proximity to illegal narcotics at the time it is
found.  (Tr. 66).

   Anderson supervised and participated in the execution of the search warrant at the
Premises.  (Tr. 49, 55).  Prior to the search, Anderson led a briefing with members of the search
team; he was unable to recall how many people attended the meeting.  (Tr. 55-56).  According to
Anderson, individuals who attended the meeting would have been identified on a briefing order

that he completed in connection with execution of the search warrant. (Tr. 56). Anderson testified that he did not discuss the specific warrant during the briefing. (Tr. 57).

Anderson entered the Premises after it had been secured by the SWAT team at approximately 6 a.m. (Tr. 60). Anderson searched the master bedroom and its closets. (Tr. 50). Anderson located a firearm holster in a hamper in one of the closets. (Tr. 50-53; G. Exs. 4-5). Anderson also located narcotics paraphernalia, including glassine baggies, in a cardboard shoebox inside the closet. (Tr. 53-54; G. Ex. 6).

Anderson testified that, in accordance with standard operating procedures, he reviewed the proposed warrant for the Premises prior to its submission to Judge Randall. (Tr. 58-59, 70). An investigator, not Anderson, submitted the proposed warrant and application to Judge Randall. (Tr. 58-59). The investigator subsequently informed Andersen that Judge Randall had issued the warrant, although the investigator never told him that Judge Randall had stricken from the warrant certain of the language relating to cellular phones; Anderson never received or reviewed the warrant after Judge Randall had signed it. (Tr. 57-59, 64-65, 70-71). Anderson acknowledged that his failure to review the signed warrant was a "significant oversight" on his part. (Tr. 64-65, 69). Anderson testified that although he did not review the signed warrant, he understood that he was authorized to search for and seize tools of the narcotics trade. (Tr. 65).

Anderson testified that even if he had he been aware of the language that Judge Randall struck from the warrant, he would still have instructed members of the search team to seize the cellular phones located inside the Premises. (Tr. 67-68). He explained that he believed that the phones were likely to contain evidence of drug-related offenses because they were found on a desk with suspected cocaine. (Tr. 66-67). He also testified that, in his view, the paragraph

8

in the warrant that authorized the seizure of electronic devices, including cellular phones – which Judge Randall did not strike – authorized the seizure of the phones.  (Tr. 68).

      C.     **Testimony of Special Agent O'Hara**

        O'Hara, a special agent with HSI, testified that he has participated in the execution of approximately 75 narcotics-related search warrants, including the warrant for the Premises.  (Tr. 71-73).  Prior to the search, O'Hara reviewed the main page of the proposed warrant, but he never reviewed the actual warrant signed by Judge Randall.  (Tr. 88).  O'Hara also participated in a pre-search briefing during which the warrant was discussed.  (Tr. 88, 92).  O'Hara estimated that approximately six to eight law enforcement officers participated in the search.  (Tr. 92).

        O'Hara testified that his role during the warrant's execution was to search for evidence of narcotics trafficking.  (Tr. 73).  O'Hara searched the desk on the main floor of the apartment and the area surrounding it.  (Tr. 73-75; G. Exs. 7, 8, 9, 10).  According to O'Hara, the desk was "cluttered" with many items, including suspected narcotics individually packaged in blue glassine bags, a handgun, two cellular phones, cash, rubber bands, and a jar containing a white powder that he believed was likely used to "cut" narcotics.  (Tr. 75-79; G. Exs. 7, 8).  O'Hara testified that the gun on the desk was loaded and in close proximity to suspected narcotics and currency.  (Tr. 76-78).

        O'Hara testified that underneath the desk he located mail and a razor blade on a plate containing residue, which later tested positive for cocaine.  (Tr. 82-83; G. Ex. 9).  According to O'Hara, drug dealers often cut large quantities of cocaine with a razor blade on a plate in order to break them into smaller amounts for individual sale.  (Tr. 83).  On the floor along the wall directly behind the desk, O'Hara observed an upper firearm receiver that was

partially covered by a sweatshirt.  (Tr. 83-85; G. Ex. 10).  According to O'Hara, an upper

receiver is the part of an automatic rifle containing the bolt assembly, barrel, and charging

handle.  (Tr. 86).

Although he acknowledged that possession of a handgun or upper receiver is not

necessarily unlawful, O'Hara explained that the proximity of guns to narcotics and cash may

evidence their use for protection in drug trafficking activities.  (Tr. 77-78, 90-91).  O'Hara

testified that drug traffickers typically use cellular phones to conduct narcotics transactions.

(Tr. 86-87).


## DECISION & ORDER

### I.     Disclosure of Confidential Informant

Hampton seeks an order compelling the government to disclose the identity of the

confidential informant who participated in the controlled purchases described in the application

for the search warrant for the Premises.  (Docket # 29 at ¶¶ 96-98).  During oral argument on the

motion, Hampton's attorney argued that testimony from the confidential informant may be

relevant to her defense because it may reveal that Hampton was not the individual who sold the

cocaine to the CI in any of the four controlled purchases that the CI made from the Premises.

The government opposes disclosure, maintaining that it does not intend to offer

any testimony from the confidential informant concerning the four controlled purchases.

(Docket # 30 at 17-18).  During oral argument, the government represented that it intends to limit

its proof at trial to testimony about the execution of the search warrant and the evidence that was

observed and seized, without offering any testimony about the basis for the warrant.[3]

---

[3]  The Court understands this representation to mean that the government will not seek to offer the warrant
application into evidence.

The disclosure of a confidential informant's identity is within the sound discretion of the district court, *DiBlasio v. Keane*, 932 F.2d 1038, 1042 (2d Cir. 1991), and the government generally is not required to disclose the identity of confidential informants, *Roviaro v. United States*, 353 U.S. 53, 59 (1957). In order to obtain such disclosure, the defendant must show that without it, she "will be deprived of [her] right to a fair trial." *United States v. Fields*, 113 F.3d 313, 324 (2d Cir.), *cert. denied*, 522 U.S. 976 (1997); *United States v. Saa*, 859 F.2d 1067, 1073 (2d Cir. 1988) (defendant entitled to identity of confidential informant only upon showing that it is essential or material to the defense), *cert. denied*, 489 U.S. 1089 (1989). A defendant's mere suggestion that disclosure will be helpful to the defense of the case is insufficient. *United States v. Fields*, 113 F.3d at 324. "[T]he district court must be satisfied, after balancing the competing interests of the government and the defense, that the defendant's need for disclosure outweighs the government's interest in shielding the informant's identity." *Id.* (citing *Roviaro v. United States*, 353 U.S. at 62). Such a need is established, according to the Second Circuit, "where the informant is a key witness or participant in the crime charged, someone whose testimony would be significant in determining guilt or innocence." *United States v. Saa*, 859 F.2d at 1073.

I find that Hampton has failed to show how disclosure of the identity of the confidential informant is essential to her defense. As an initial matter, the charges in the indictment do not arise from any of the controlled purchases conducted by the confidential informant; rather, Hampton is charged with narcotics and firearms possession stemming from the items found during the warrant execution. (Docket # 1). Accordingly, it does not appear that the confidential informant was either a witness to or participant in the charged offenses. *See United States v. Hyman*, 128 F. App'x 195, 197 (2d Cir. 2005) (summary order) (district court did not err by denying defendant's motion for disclosure of confidential informant identity "whose

account of having purchased drugs from someone in the apartment led to the issuance of the warrant pursuant to which police entered that apartment and arrested [defendant] [;] . . . [t]he presence . . . of another unidentified man [from whom the confidential informant purchased narcotics] in the apartment does not logically subvert the government's proof that [defendant] was the [individual] who possessed the drugs"); *United States v. Williams*, 339 F. Supp. 3d 129, 134 (W.D.N.Y. 2018) ("[the magistrate judge] appropriately concluded that [d]efendant failed to meet his burden [for disclosure], where the [g]overnment represented that [d]efendant's charged conduct did not involve the controlled purchases with the [confidential informant]").  Moreover, the government has represented that it does not intend to offer testimony of the confidential informant at trial or to introduce proof concerning the controlled purchases.  *See United States v. Swinton*, 797 F. App'x 589, 597 (2d Cir. 2019) (summary order) ("[a]t trial, the [g]overnment did not call the [confidential source] to testify nor did it rely on evidence about the [confidential source] to establish [defendant's guilt[;] [t]he [confidential source's] identity was therefore not material to the defense"), *cert. denied*, 140 S. Ct. 2791 (2020); *United States v. Nix*, 2016 WL 11268960, *6 (W.D.N.Y. 2016) ("the [confidential informants] were neither key witnesses, nor participants, in the crimes for which [defendant] has been indicted: the [i]ndictment charges [defendant] with possession of heroin and cocaine seized from the three premises – not the controlled purchases with [confidential informant] – and there is no evidence that the [confidential informants] were present for the execution of the warrants to obtain first-hand knowledge of the charged offenses"), *report and recommendation adopted by*, 2017 WL 65329 (W.D.N.Y. 2017).

On this record, I find that Hampton's interest in learning the identity of the confidential information is outweighed by the government's interest in protecting it.

Accordingly, Hampton's motion for disclosure of the identity of the confidential informant is denied.[4]

## II. *Brady* and/or Discovery Violations

I also find that there is no basis to conclude that the government committed any discovery or *Brady* disclosure violations in connection with the evidentiary hearing. Prior to the evidentiary hearing, Hampton filed omnibus motions seeking, *inter alia*, discovery and *Brady* material from the government. (Docket # 29 at ¶¶ 76-87). During oral argument on the motions, the Court asked defense counsel whether there were any outstanding issues with respect to *Brady* material or discovery that the defense believed the government had failed to provide. Defense counsel responded that he was not aware of any outstanding issues regarding discovery and inspection, and he identified potential *Brady* issues not relevant to this dispute. Significantly, defense counsel did not raise any issues regarding documents relating to the pre-search briefing.

During the hearing, Anderson testified that he was unable to recall how many people attended the pre-search briefing he conducted. (Tr. 56). Hampton's counsel asked whether such information was recorded, and Anderson testified that a log identifying individuals who attended the meeting would have been included in a briefing order that he had completed in connection with the search. (*Id.*). Although this document had not been provided by the government, defense counsel did not request a copy of the document, nor did he inquire of

___

[4] In reaching this conclusion, I make no findings concerning whether the government is obligated under *Brady* to disclose to the defense any information provided by the confidential informant. "[T]he government's *Brady* disclosure obligation extends to any communications or statements which either (1) affirmatively indicate that [Hampton] was not engaged in wrongdoing, or (2) omit mention of [Hampton] and were (a) made by a witness in a position to know whether [Hampton] was engaged in illegal conduct, (b) in a context in which the person likely would have mentioned [Hampton] if he [or she] believed [Hampton] had committed criminal acts." *See United States v. Brock*, 2015 WL 8732432, *15 (W.D.N.Y. 2015) (internal quotations omitted), *report and recommendation adopted by*, 2016 WL 1168479 (W.D.N.Y.), *order amended and superseded by*, 2016 WL 3743242 (W.D.N.Y. 2016).

Anderson what other information, if any, would be contained in the document.  (*Id.*).  Further, defense counsel did not request to adjourn or suspend Anderson's testimony pending production of the document.

Hampton now seeks an order from this Court finding that the government violated its *Brady* or discovery obligations by not producing a copy of the briefing order prior to the evidentiary hearing.  (Docket ## 40 at 13-14; 46 at 4).  In seeking this relief, Hampton speculates that the document contains a range of information including "the date and place of the search, identity of the members conducting the search, identity of the [p]eople and places to be searched, identity of those present during the search, a description of the nature and extent of the search, any weapons, evidence or contraband found during the search, the basis for initiating the search[,] the name of the supervisor who sanctioned the search, equipment used[,] . . . tactics and strategies that will be employed, special hazards and personal protection needs[,] and post search warrant debriefing."  (Docket # 40 at 14).  Of course, the record does not support Hampton's speculation concerning the contents of the document.

As an initial matter, I do not find that a log of the individuals who attended the pre-search meeting, which is the only information that the record establishes was contained within the briefing report, constitutes exculpatory material required by the government to be turned over under *Brady*.  Moreover, even assuming that the briefing report is discoverable by the defense – a contention disputed by the government (*see* Docket # 43 at 11-12 (citing *United States v. Busch*, 2013 WL 104916, *1-2 (W.D.N.Y. 2013) and *United States v. Salyer*, 271 F.R.D. 148, 181-82 (E.D. Cal.), *adhered to as modified on reconsideration by*, 2010 WL 3036444 (E.D. Cal. 2010)) – I find no basis on this record to conclude that the government violated any disclosure obligations.  Having said that, considering that Hampton has now

requested production of the document, the parties should confer regarding its production and
return to the Court in the event the parties are unable to resolve any issues concerning its
production.

## REPORT AND RECOMMENDATION

Hampton seeks suppression of the evidence seized during the execution of the
warrant for the Premises on November 18, 2021.  (Docket ## 29 at ¶¶ 27-53; 40 at 1-13; 41; 46
at 1-4).  As defense counsel clarified during oral argument, Hampton challenges the validity of
the search warrant on the grounds that it was unsupported by probable cause because it was
substantially based upon information provided by an unreliable confidential informant.  (Docket
# 29 at ¶¶ 30, 37, 40-42).  She also maintains that she is entitled to a *Franks* hearing because of
material omissions and misstatements relating to the confidential informant in Prance's affidavit.
(*Id.* at ¶¶ 36, 38).  Hampton also argues that suppression is warranted because the agents
executing the warrant impermissibly conducted a general exploratory search that far exceeded
the scope of the warrant.  (Docket ## 29 at ¶¶ 46-53; 40 at 1-13; 46 at 1-4).

## I.    Motion for *Franks* Hearing

Hampton contends that she is entitled to a *Franks* hearing because Prance's
affidavit submitted in support of the search warrant application contained allegedly false or
misleading statements.  (Docket # 29 at ¶¶ 36, 38, 43, 44).  She contends that these false and
misleading statements were material to the issuing judge's probable cause determination and,
when excised from the affidavit, invalidate the warrant and mandate suppression of the evidence
seized pursuant to it.  (*Id.*).

Ordinarily, a reviewing court's obligation is merely to determine that the issuing judge had a "substantial basis for ... conclud[ing] that probable cause existed." *United States v. Smith*, 9 F.3d 1007, 1012 (2d Cir. 1993) (quoting *Illinois v. Gates*, 462 U.S. 213, 238-39 (1983)) (internal quotation omitted); *Walczyk v. Rio*, 496 F.3d 139, 157 (2d Cir. 2007) ("a reviewing court must accord considerable deference to the probable cause determination of the issuing magistrate"). "Nevertheless, little or no deference is due where the government's affidavit misstated or omitted material information about probable cause." *United States v. Rajaratnam*, 2010 WL 4867402, *7 (S.D.N.Y. 2010) (citing *United States v. Canfield*, 212 F.3d 713, 717 (2d Cir. 2000)), *aff'd*, 719 F.3d 139 (2d Cir. 2013), *cert. denied*, 573 U.S. 916 (2014).

Under *Franks v. Delaware*, 438 U.S. 154 (1978), "a district court may not admit evidence seized pursuant to a warrant if the warrant was based on materially false and misleading information." *United States v. Levasseur*, 816 F.2d 37, 43 (2d Cir. 1987) (citing *Franks v. Delaware*, 438 U.S. at 154). To justify a *Franks* hearing, a defendant challenging an affidavit must make "a substantial preliminary showing that (1) the affidavit contained false statements made knowingly or intentionally, or with reckless disregard for the truth; and (2) the challenged statements or omissions were necessary to the Magistrate's probable cause finding." *Id.* (citing *Franks*, 438 U.S. at 171-72) (internal quotation omitted). A hearing is required if the defendant provides the court with a sufficient basis upon which to doubt the truth of the affidavit at issue. As the Supreme Court has explained:

> To mandate an evidentiary hearing, the challenger's attack must be more than conclusory and must be supported by more than a mere desire to cross-examine. There must be allegations of deliberate falsehood or of reckless disregard for the truth, and those allegations must be accompanied by an offer of proof. They should point out specifically the portion of the warrant affidavit that is claimed to be false; and they should be accompanied by a statement of supporting reasons. Affidavits or sworn or otherwise

16

reliable statements of witnesses should be furnished, or their
absence satisfactorily explained.

*Franks*, 438 U.S. at 171.

With respect to the first prong, "[a]llegations of negligence or innocent mistake
are insufficient. *Id.* Instead, "[t]he focus is not on whether a mistake was made, but rather on
the intention behind the mistake." *United States v. Markey*, 131 F. Supp. 2d 316, 324 (D. Conn.
2001) (citing *Beard v. City of Northglenn*, 24 F.3d 110, 116 (10th Cir. 1994)), *aff'd sub nom.
United States v. Simpson*, 69 F. App'x 492 (2d Cir. 2003). Thus, *Franks* teaches that not all
statements in an affidavit have to be true; instead, "the statements [must] be 'believed or
appropriately accepted by the affiant as true.'" *See United States v. Campino*, 890 F.2d 588, 592
(2d Cir. 1989) (quoting *Franks*, 438 U.S. at 165), *cert. denied*, 498 U.S. 866 (1990).

To determine whether a misstatement in an affidavit is material, the court must
"set[ ] aside the falsehoods in the application . . . and determine [w]hether the untainted portions
[of the application] suffice to support a probable cause . . . finding." *United States v.
Rajaratnam*, 719 F.3d 139, 146 (2d Cir. 2013) (internal quotations and citations omitted), *cert.
denied*, 573 U.S. 916 (2014). According to the Second Circuit, "[t]he ultimate inquiry is
whether, after putting aside erroneous information and [correcting] material omissions, there
remains a residue of independent and lawful information sufficient to support [a finding of]
probable cause." *Id.* (quoting *United States v. Canfield*, 212 F.3d at 718).

Hampton contends that Prance's statement about the reliability of the CI was too
conclusory to be credited and was misleading because it did not include any information
concerning the CI's criminal history. (Docket # 29 at ¶ 37). I agree with the government that
Hampton's contention does not entitle her to a *Franks* hearing.

17

The only material omission or falsehood identified by Hampton is the absence from Prance's affidavit of any information concerning the CI's criminal history. Of course, because an informant's identity is typically kept confidential in applications for search warrants, it is not unusual for such affidavits to omit information concerning an informant's prior criminal history, and such omissions generally do not warrant a *Franks* hearing. *See United States v. Ortiz*, 2022 WL 17688087, *2 (D. Vt. 2022) ("the absence of the informant's criminal history from the affidavit is not a material omission requiring a *Franks* hearing"); *United States v. Akparanta*, 2019 WL 5616875, *6 (S.D.N.Y. 2019) ("the omission of [the confidential informant's] criminal history from the [a]ffidavit is not evidence of either a 'deliberate falsehood' or an 'offer of proof' sufficient to warrant a *Franks* hearing"); *United States v. Pecker*, 2006 WL 8423960, *5 (E.D.N.Y. 2006) ("[the affiant] testified that, to his knowledge, an informant's criminal history is usually not included in the search warrant to protect the informants, and that generally persons in close proximity to drug dealers and drug activities tend to have drug records[;] . . . defendant failed to show that the warrant affidavit contained material misrepresentations or omissions that were intentionally or recklessly made"). "Nor is a *Franks* hearing justified by [Hampton's] contention that [Prance's] statement that he knows the CI to have previously provided reliable information in connection with investigations is too conclusory to be credited." *See United States v. Moody*, 2021 WL 202698, *8 (W.D.N.Y.), *report and recommendation adopted by*, 2021 WL 1054372 (W.D.N.Y. 2021). Accordingly, I recommend denial of Hampton's motion for a *Franks* hearing.

II.    **Validity of the Warrant**

The Fourth Amendment provides that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. CONST. AMEND. IV. Whether a search warrant satisfies the Fourth Amendment's probable cause requirement is judged under the now-familiar "totality of the circumstances" test. *Illinois v. Gates*, 462 U.S. 213, 238 (1983). The issuing judicial officer must "make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, including the 'veracity' and 'basis of knowledge' of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Id*. A reviewing court's obligation is merely to determine that the issuing judge had a "'substantial basis for...conclud[ing]' that probable cause existed." *United States v. Smith*, 9 F.3d at 1012 (quoting *Gates*, 462 U.S. at 238-39) (internal quotation omitted). Moreover, "resolution of marginal cases should be determined by the preference to be afforded to warrants." *Id*. (citing *Jones v. United States*, 362 U.S. 257, 270 (1960)).

In evaluating the totality of the circumstances, the court may consider whether the information an informant provides is corroborated by independent police investigation. *Canfield*, 212 F.3d at 719-20. Information provided by a known, reliable confidential informant may be sufficient to establish probable cause, especially where law enforcement officials have corroborated the information. *See United States v. Wagner*, 989 F.2d 69, 73 (2d Cir. 1993) ("information provided by an informant from whom the government has received consistently reliable information in the past is likely to be sufficiently reliable to establish probable cause") (internal quotation omitted); *United States v. Sykes*, 304 F. App'x 10, 12 (2d Cir. 2008) (finding probable cause for search warrant based on reliable informant's observations, which were

19

corroborated by police), *cert. denied*, 556 U.S. 1197 (2009); *United States v. Gagnon*, 373 F.3d 230, 236 (2d Cir. 2004). Information from an informant whose identity is known to law enforcement is generally entitled to more credence than information from an anonymous tipster because the former may be held accountable for the information provided. *See United States v. Salazar*, 945 F.2d 47, 50-51 (2d Cir. 1991), *cert. denied*, 504 U.S. 923 (1992). In addition, "[a]n informant's participation in supervised drug purchases is powerful corroborative evidence for purposes of determining probable cause." *United States v. Wagner*, 989 F.2d at 73.

       Hampton contends that Prance's affidavit was inadequate to support the warrant because it was based upon conclusory allegations concerning the reliability of CW. (Docket # 29 at ¶ 36). Just as Hampton's challenge fails to justify a *Franks* hearing, it likewise fails to demonstrate that the affidavit was deficient.

       As stated above, Prance's affidavit described four controlled purchases of cocaine from the Premises. All of the sales were made by individuals from the door to the apartment, leading to the reasonable inference that cocaine was stored inside the apartment and that the apartment was being used for drug trafficking activities. The purchases were made by a known informant who had previously provided law enforcement with credible information about drug trafficking. In addition, Prance searched the CI before and after each controlled purchase, drove the CI to the Premises immediately prior to the purchase, and transported the CI from the area immediately after each transaction, corroborating the informant's reported purchases of cocaine from individuals at the residence. Taken together, these assertions provided ample probable cause for the issuance of the warrant. *See, e.g., United States v. McCoy*, 303 F. App'x 45, 49 (2d Cir. 2008) (summary order) (probable cause for warrant established where affiant asserted that informant, who had previously provided reliable information about drug trafficking, had

identified the particular apartment inside building from which he made two controlled purchases of narcotics); *Smith*, 9 F.3d at 1012-15 (probable cause for search warrant established by information provided by informant who made controlled purchases from location for which warrant issued); *United States v. Harris*, 2013 WL 1285860, *3 (D. Vt. 2013) (probable cause for warrant established by assertions of "[p]rior controlled purchases of drugs . . . at the residence within two days of the warrant . . . [and] independent[] corroborat[ion] [of] information provided by the informant"); *Velasquez v. City of New York*, 2012 WL 232432, *7 n.2 (S.D.N.Y. 2012) ("[w]here a confidential informant previously has provided reliable information and where the confidential informant has conducted controlled purchases of narcotics, courts have found probable cause to support a search warrant") (citations omitted).  On this record, I recommend that the district court deny Hampton's probable cause challenge to the warrant.

### III.    <u>Execution of the Warrant</u>

I turn next to Hampton's challenge to the officers' execution of the warrant. Hampton contends that the executing officers' failure to review the signed warrant issued by Judge Randall transformed the search into an impermissible general search.  (Docket ## 40 at 1-13; 46 at 1-4).  Moreover, Hampton continues, the officers conducted that general search in "flagrant disregard" of the warrant, as demonstrated by their seizure of evidence not authorized by the warrant, namely, firearms and cellular phones.  (*Id.*).

The government counters that the officers' seizure of the phones was indeed authorized by the warrant and that, in any event, the phones were permissibly seized under the plain view doctrine.  (Docket # 43 at 4-10).  The government further represents that it never

searched the cellular phones that it seized, one of which was returned to Hampton, and that it will not seek to introduce at trial any evidence from the phones. With respect to the firearms and holster that were seized, the government maintains that they were properly seized after being discovered in plain view during the authorized search for narcotics. (*Id.* at 6-10). The government maintains that blanket suppression is not warranted because the search of the premises did not resemble a general search. (*Id.* at 4-6).

"A search must be confined to the terms and limitations of the warrant authorizing it." *United States v. Matias*, 836 F.2d 744, 747 (2d Cir. 1988). The plain view doctrine "authorizes seizure of illegal or evidentiary items visible to a police officer whose access to the object has some prior Fourth Amendment justification and who has probable cause to suspect that the item is connected with criminal activity." *Illinois v. Andreas*, 463 U.S. 765, 771 (1983). Application of the plain view exception requires: first, that the officer have a legitimate right to be in the location from which the object was plainly viewed; second, that the item's incriminating character be immediately apparent; and third, that the officer have lawful access to the object. *Horton v. California*, 496 U.S. 128, 136-37 (1990).

In ordinary cases, when officers seize evidence outside the scope of a warrant, the appropriate remedy is suppression of those items only. *United States v. Matias*, 836 F.2d at 747. By contrast, blanket suppression, a remedy that the Second Circuit has characterized as "drastic" and reserved for "the most extraordinary of cases," is justified only when agents "flagrantly disregard" the terms of a warrant (1) by effecting a "widespread seizure of items that were not within the scope of the warrant" and (2) by not acting in "good faith." *United States v. Liu*, 239 F.3d 138, 140, 142 (2d Cir. 2000) (internal quotations omitted), *cert. denied*, 534 U.S. 816 (2001). As the Second Circuit has explained, "[t]he rationale for blanket suppression is that a

search that greatly exceeds the bounds of a warrant and is not conducted in good faith is essentially indistinguishable from a general search." *Id.* at 141.  Executing agents act in good faith "when they perform searches in objectively reasonable reliance on binding appellate precedent." *United States v. Ganias*, 755 F.3d 125, 136 (2d Cir. 2014), *vacated on reh'g en banc on other grounds*, 824 F.3d 199 (2d Cir. 2016).  Moreover, suppression is appropriate "only where the benefits of deterring the [g]overnment's unlawful actions appreciably outweigh the costs of suppressing the evidence." *Id.* (quoting *Herring v. United States*, 555 U.S. 135, 141 (2009)).

    Hampton maintains that the executing officers' failure to review the signed warrant issued by Judge Randall transformed the search into a general one that resulted in the seizure of items not authorized by the warrant.  She also contends that Anderson's testimony that he would have instructed officers to seize the cellular telephones even if he had known that Judge Randall had stricken certain of the cellular phone language from the warrant demonstrates that the executing officers conducted the search in bad faith disregard of the warrant, warranting wholesale suppression.

    As an initial matter, evidence that the officers who executed a warrant conducted a search without first reading the warrant does not, without more, transform the search into an impermissible general search.  *See United States v. Armstrong*, 406 F. App'x 500, 501 (2d Cir. 2010) (summary order) (officers lawfully conducted search without reviewing warrant after being informed that a warrant for narcotics search had been authorized); *United States v. Perrone*, 936 F.2d 1403, 1413 n.4 (2d Cir.) (upholding search where supervising agent did not review executed warrant because he "knew what [the executing agents] would be searching for"), *clarified on rehearing on other grounds*, 949 F.2d 36 (2d Cir. 1991); *United States v.*

*Chen*, 979 F.2d 714, 718 (9th Cir. 1992) ("the installation of the extra camera may have been caused in part because the agents installing the cameras did not read or fully understand the terms of the warrant[;] [t]hese facts, however, do not indicate that there was a flagrant disregard justifying the suppression of all of the evidence"); *United States v. Whitten*, 706 F.2d 1000, 1010 (9th Cir. 1983) (denying blanket suppression where some of the executing officers never read the warrant; "[a]lthough the search was not scrupulously confined to the terms of the warrant, it does not follow necessarily that all of the evidence seized must be suppressed"), *cert. denied*, 465 U.S. 1100 (1984); *United States v. Dubrofsky*, 581 F.2d 208, 213 (9th Cir. 1978) (upholding execution of the warrant "on the particular facts of th[e] case" where agent was telephonically advised "that the warrant had been issued, but was not informed of the specific items authorized to be seized"). Also relevant to the issue of whether the search was conducted lawfully are the officers' knowledge about the terms and scope of the warrant, the manner in which they actually conducted the search, and the quantity and type of evidence, if any, seized outside the warrant's authorization. *See United States v. Dubrofsky*, 581 F.2d at 213 (upholding search where executing officer had not reviewed the warrant but was familiar with the investigation, was informed that a warrant had been issued, and had assumed the warrant authorized the "usual search" for evidence related to offense of importation arising from controlled deliveries, and where the actual search "conformed to the specifications of the warrant"); *United States v. Brown*, 596 F. Supp. 2d 611, 627 (E.D.N.Y. 2009) (upholding search where supervising officer had not been involved in investigation and had not reviewed the warrant but was aware that a warrant had issued permitting a search for narcotics, and where the search "substantially complied with the procedural restrictions contained in the body of the warrant itself"), *aff'd sub nom. United States v. Armstrong*, 406 F. App'x 500 (2d Cir. 2010).

In this case, Anderson, who reviewed the application and proposed warrant before its submission to Judge Randall, participated in the search and supervised the warrant's execution.  Anderson was informed by a team investigator that the warrant had been issued; he was not informed, however, that Judge Randall had stricken some language in the warrant.[5] With the exception of the language stricken by Judge Randall, Anderson was familiar with the scope of the authorized search, and he testified that he understood that he was authorized to search for evidence of narcotics trafficking.  Similarly, O'Hara, who had reviewed only a portion of the proposed warrant, testified that he understood that he was permitted to conduct a search for evidence of narcotics trafficking.  Both officers testified that they had substantial experience executing narcotics warrants, and nothing in the record suggests that they deviated from their customary procedures for conducting such searches.  *See Dubrofsky*, 581 F.2d at 213 ("[the agent] testified that he had participated in searches of residences following arrests for importation pursuant to controlled deliveries on at least ten occasions, and assumed that the warrant authorized the usual search for [evidence of residency], narcotics, and narcotics paraphernalia").  Although Goodfriend testified that he had never reviewed the warrant, and it is unclear whether he understood the scope of the authorized search, he did not participate in the actual search as his role was limited to securing the premises.

Moreover, the hearing testimony established that the *search* that was conducted was within the bounds of the valid warrant.  The warrant authorized a search of the apartment for evidence of narcotics and narcotics trafficking.  Accordingly, the officers were authorized to look anywhere in the apartment where such evidence could be found.  *United States v. Ross*, 456 U.S. 798, 820-21 (1982) ("[a] lawful search of fixed premises generally extends to the entire area

---

[5] No testimony was elicited as to why the investigator did not inform Anderson of the stricken language.

in which the object of the search may be found").  Although the officers *seized* items not authorized by the warrant, including firearms and a holster, the testimony demonstrates that the officers found those items in plain view in areas where the officers were authorized by the warrant to search.  The upper firearms receiver was on the floor behind a desk, partially covered by a sweatshirt, and the holster was discovered in a laundry hamper that Anderson was searching for evidence of narcotics.  The handgun was located in plain view on the desk, which also contained cocaine, narcotics paraphernalia, cash, and cellular phones.

Based on the evidence adduced during the hearing, I reject Hampton's contention that the firearms were impermissibly seized because the officers did not know whether Hampton's possession of them was unlawful.  (*See* Docket # 30 at 11).  The evidence shows that they were found in close proximity to narcotics and narcotics paraphernalia, and thus were lawfully seized under the plain view doctrine.  *See United States v. McCloud*, 303 F. App'x 916, 919 (2d Cir. 2008) (summary order) (firearms properly seized under plain view doctrine; "[t]he connection between a loaded rifle and evidence of drug-packaging in the foyer cannot be doubted, as we have frequently noted that 'a gun is generally considered a tool of the trade for drug dealers'") (quoting *United States v. Wallace*, 532 F.3d 126, 131 (2d Cir. 2008)); *United States v. Gamble*, 388 F.3d 74, 77 (2d Cir. 2004) ("there is no dispute that the ammunition clip was found in plain view in the drawer[;] . . . the officers had probable cause to believe that the ammunition clip was connected with criminal activity because ammunition is a recognized tool of the drug-dealing trade"); *United States v. Hayes*, 2016 WL 3225944, *6 (W.D.N.Y. 2016) ("[t]he discovery of the shotgun occurred while police officers were searching places that reasonably could have harbored drugs and related paraphernalia[;] [t]he plain-view exception then applies, since police had a lawful right of access to the location where they viewed evidence

of a facially incriminating nature") (quotations omitted); *United States v. Graziano*, 558 F. Supp. 2d 304, 311 (E.D.N.Y. 2008) ("when [executing officers] observed . . . weapons in plain view during . . . search [for other evidence], the officers were authorized to seize them").

At first blush, the question of the lawfulness of the seizure of the phones appears more complicated by the mix in the warrant of the language regarding cell phones that was stricken and that which was retained.  There are, of course, many possible reasons why an issuing judge may choose to strike out language or provisions in a proposed warrant.  For example, the judge may determine to strike out language or provisions that the judge considers superfluous, or unduly vague, or insufficiently particular.  So, too, may a judge excise provisions that he or she finds unsupported by probable cause.  Where that occurs, the excisions may reflect the judge's assessment that probable cause is lacking to establish that the particular item is evidence of a crime or that it will be found at the premises to be searched, or both.  Because the warrant signed by Judge Randall for the Premises reflects only the changes, and not the explanations for them, a reviewing court could only speculate as to the reasons he chose to retain one provision regarding cell phones and strike other provisions and language.

A warrant should be interpreted based upon its plain language and not based upon speculation.  *See United States v. Swinton*, 251 F. Supp. 3d 544, 551 (W.D.N.Y. 2017) ("[t]he [c]ourt looks 'directly to the text of the search warrant to determine the permissible scope of an authorized search'") (quoting *United States v. Bershchansky*, 788 F.3d 102, 111 (2d Cir. 2015)), *aff'd*, 797 F. App'x 589 (2d Cir. 2019), *cert. denied*, 140 S. Ct. 2791 (2020).  Indeed, language that has been struck from a warrant should be considered a nullity.  *United States v. Peake*, 804 F.3d 81, 89 (1st Cir. 2015) ("[a]s to the magistrate judge's crossing out of 'personal digital assistant' . . . , we conclude that the crossed-out text should simply be treated as nonexistent[;]

[defendant] does not point us to any case law establishing that eliminating a part of the text from a draft warrant necessarily means that the crossed-out statements have continued significance"), *cert. denied*, 580 U.S. 814 (2016).  Guided by these principles, I determine that the warrant did authorize the seizure of the cellular telephones found inside the Premises.  The warrant expressly authorized the seizure of electronic devices "used for the purposes of video and/or audio surveillance to include surveillance cameras, video cameras, and any device to store media, video, pictures, and images from the cameras, to include . . . cellular telephone devices, . . . as well as the content of such devices."  (Docket # 29-2 at 3-4).  Prance's affidavit contained a representation that surveillance devices are typically used by narcotics dealers to alert them to the presence of law enforcement officers (Docket # 29-1 at 11); in addition, advances in technology have enabled cellular telephones to be used to monitor or review images captured by doorbell cameras or other security cameras.  I find that this provision authorized the *seizure* of the cellular phones as a device that could have stored video or audio surveillance.  *See United States v. Peake*, 804 F.3d at 88-89 (agents lawfully seized and searched Blackberry device despite language referencing "personal digital assistants" having been struck from warrant by magistrate judge; "[defendant] is mistaken in his reliance on the stricken paragraph; other, intact passages in the warrant expressly demonstrate that the magistrate judge approved searching for all documents . . . stored in "an electronic or digital format"[;] . . . the agents would have been permitted to seize [defendant's] Blackberry, so long as the remaining text of the warrant was valid and authorized them to do so").  Had the contents of the seized phones been *searched* – which the government represented did not happen – additional evidence may have been required to demonstrate that the scope of the search was within the bounds of the warrant.

Although I conclude that the seizure of the phones was authorized by the plain language of the warrant, the agents did not in fact review the language of the actual warrant signed by the judge before or during the execution of the search.  That failure is indeed troubling and, as Anderson testified, constitutes a "significant" lapse and one that could have led to the blanket suppression of evidence under different circumstances, such as, if the executing search team members had no knowledge of the warrant that had been submitted to or signed by the judge, if the breadth of the search had exceeded the authorized scope, and/or if a substantial volume of the evidence taken had been outside the delineation of items authorized to be seized.  Moreover, in close cases, failure to read the warrant may render unavailing an otherwise meritorious *Leon* exception.  *United States v. Cofield*, 2007 WL 2670288, *8 (M.D. Ala.) ("[b]ecause the [executing officer] did not read the warrant, his reliance on it was not reasonable or in good faith[;] [t]he court concludes that *Leon* does not protect the search and seizure from suppression in this case"), *report and recommendation adopted as modified by*, 2007 WL 2670278, *3 (M.D. Ala. 2007) (concluding only leaders of search team are required to read warrant; "any duty to read the warrant rested squarely with . . . the lead officer").  I strongly urge the law enforcement agencies involved in the search in this case to ensure that their search warrant procedures include the requirement that appropriate members of a search team review the actual warrant issued by a judge before conducting the search.

For all of the reasons explained above, I recommend that Hampton's motion to suppress the evidence seized from the Premises be denied.

## <u>CONCLUSION</u>

For the reasons stated above, I deny Hampton's motion for disclosure of the identity of the confidential informant and her motion for an order finding that the government violated its *Brady* and/or discovery obligations.  (Docket ## 29, 40, 46).  In addition, I recommend that the district court deny Hampton's motions for a *Franks* hearing and for an order suppressing tangible evidence.  (Docket ## 29, 40, 46).

**IT IS SO ORDERED.**

*s/Marian W. Payson*

MARIAN W. PAYSON
United States Magistrate Judge

Dated:  Rochester, New York
        January 2, 2024

Pursuant to 28 U.S.C. § 636(b)(1), it is hereby

  **ORDERED**, that this Report and Recommendation be filed with the Clerk of the Court.

  **ANY OBJECTIONS** to this Report and Recommendation must be filed with the Clerk of this Court within fourteen (14) days after receipt of a copy of this Report and Recommendation in accordance with the above statute and Rule 59(c) of the Local Rules of Criminal Procedure for the Western District of New York.[6]

  The district court will ordinarily refuse to consider on *de novo* review arguments, case law and/or evidentiary material which could have been, but was not, presented to the magistrate judge in the first instance. *See*, *e.g.*, *Paterson-Leitch Co. v. Mass. Mun. Wholesale Elec. Co.*, 840 F.2d 985 (1st Cir. 1988).

  **Failure to file objections within the specified time or to request an extension of such time waives the right to appeal the District Court's Order.** *Thomas v. Arn*, 474 U.S. 140 (1985); *Small v. Sec'y of Health & Human Servs.*, 892 F.2d 15 (2d Cir. 1989); *Wesolek v. Canadair Ltd.,* 838 F.2d 55 (2d Cir. 1988).

  The parties are reminded that, pursuant to Rule 59(c)(2) of the Local Rules of Criminal Procedure for the Western District of New York, "[w]ritten objections . . . shall specifically identify the portions of the proposed findings and recommendations to which objection is made and the basis for each objection, and shall be supported by legal authority." **Failure to comply with the provisions of Rule 59(c)(2) may result in the District Court's refusal to consider the objection.**

  Let the Clerk send a copy of this Order and a copy of the Report and Recommendation to the attorneys for the parties.

**IT IS SO ORDERED.**

          *s/Marian W. Payson*
           MARIAN W. PAYSON
          United States Magistrate Judge

Dated: Rochester, New York
   January 2, 2024

---

[6] Counsel is advised that a new period of excludable time pursuant to 18 U.S.C. § 3161(h)(1)(D) commences with the filing of this Report and Recommendation. Such period of excludable delay lasts only until objections to this Report and Recommendation are filed or until the fourteen days allowed for filing objections has elapsed. *United States v. Andress*, 943 F.2d 622 (6th Cir. 1991); *United States v. Long*, 900 F.2d 1270 (8th Cir. 1990).